THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| K.Z., and E.Z.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED HEALTHCARE INSURANCE COMPANY, and UNITED BEHAVIORAL HEALTH.<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER REGARDING PLAINTIFFS' [105] MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' [58] MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:21-cv-00206-DBB<br><br>District Judge David Barlow |

Before the court are the parties' cross-motions for summary judgment.[1] Plaintiffs K.Z. and E.Z. (collectively "Plaintiffs") sued Defendant United Healthcare Insurance Company and United Behavioral Health (collectively "United" or "Defendants") under the Employee Retirement Income Security Act of 1974 ("ERISA").[2] Plaintiffs contend that United wrongly denied coverage for E.Z.'s treatment at Northwest Passage and that United violated the Mental Health and Parity and Addiction Equity Act ("MHPAEA" or "Parity Act").[3] For the reasons below, the court grants in part and denies in part Plaintiffs' motion and denies Defendants' motion.

## BACKGROUND

*Plan Structure, Coverage, and Level of Care Guidelines*

---

[1] Defs.' Mot. Summ. J. ("Defs.' MSJ"), ECF No. 58, filed March 2, 2023; Pls.' Mot. Summ. J. ("Pls.' MSJ"), ECF No. 105, filed November 16, 2023.
[2] Am. Compl., ECF No. 26, filed December 6, 2021.
[3] *Id*. ¶¶ 40–75; *See* 29 U.S.C. § 1132(a)(1)(B); 29 U.S.C. § 1132(a)(3).

Plaintiff K.Z. participated in an employee welfare group health insurance plan (the "Plan") subject to ERISA.[4] As a dependent of K.Z., E.Z. was a beneficiary under the Plan.[5] United is the Claims Administrator for the Plan, which grants United the authority to decide "whether this Benefits plan will pay for . . . the cost of a health care service.[6] It also has "the final authority to . . . Interpret Benefits . . . [and] [m]ake factual determinations relating to Benefits."[7]

Under the Plan, benefits are covered if United determines them to be Medically Necessary.[8] Even if service is recommended or prescribed by a physician, the Plan will still exclude coverage if United determines that it is not Medically Necessary.[9] United defines Medically Necessary (in relevant part) as:

> [H]ealth care services provided for the purpose of preventing, evaluating, diagnosing or treating a sickness, injury, mental illness, substance-related and addictive disorders, condition, disease or its symptoms, that are all of the following as decided solely by us or our designee
> - in accordance with *Generally Accepted Standards of Medical Practice.*
> - Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for your sickness, injury, mental illness, substance related and addictive disorders, disease or its symptoms.[10]

Among the benefits the Plan offers is treatment for mental-health conditions.[11] Such treatment is available at various levels of care.[12] For patients requiring the least intensive care,

---

[4] Am. Compl. ¶ 3.
[5] *Id.* at ¶ 3.
[6] *Id.* at ¶ 2; Rec. 8, 200, 399.
[7] Rec. 8, 200, 399.
[8] Rec. 11, 203, 402.
[9] Rec. 29, 221, 420.
[10] Rec. 63, 260, 459.
[11] Rec. 17, 210, 409.
[12] *Id.*

outpatient services are available.[13]  For patients requiring the most intensive care, inpatient

hospital care is available.[14]  For patients requiring more than what outpatient services offer but

less than inpatient hospital care, two forms of intermediate care are available.  The less intensive

of the two is a Partial Hospitalization Program ("PHP"), the more intensive is Residential

Treatment Center ("RTC") care.[15]  Defendants utilize Level of Care Guidelines to describe the

criteria to obtain coverage for the various levels of mental health treatment.[16]

For the relevant period here, Defendants used the "Optum Level of Care Guidelines:

Mental Health Conditions" that were effective as of May 2017, February 2018, and February 12,

2019 (the "LOCG's"). These define an RTC as:

> A sub-acute facility-based program which delivers 24-hour/7-day assessment and
> diagnostic services, and active behavioral health treatment to members who do
> not require the intensity of nursing care, medical monitoring and physician
> availability offered in Inpatient.
>
> The course of treatment in a Residential Treatment Center is focused on
> addressing the factors that precipitated admission (*e.g.*, changes in the member's
> signs and symptoms, psychosocial and environmental factors, or level of
> functioning) to the point that the member's condition can be safely, efficiently
> and effectively treated in a less intensive level of care.[17]

The LOCG's provide coverage criteria at various stages of treatment: admission,

continued care, and discharge. First, the LOCG's describe the common admission criteria for all

levels of care:

> The member's current condition cannot be safely, efficiently, and effectively
> assessed and/or treated in a less intensive level of care.
> ***
> AND

---

[13] Rec. 17, 23, 65, 210, 215, 259, 409, 459.
[14] *Id.*
[15] *See* Rec. 17, 210, 409.
[16] Rec. 595–608, 609–622, 623–652.
[17] Rec. 603-604, 617-18, 637.

The member's current[18] condition can be safely, efficiently, and effectively assessed and/or treated in the proposed level of care. Assessment and/or treatment of the factors leading to admission require the intensity of services provided in the proposed level of care.

\*\*\*

AND

Service(s) are the following:[19]

- Consistent with generally accepted standards of clinical practice;
- Consistent with services backed by credible research soundly demonstrating that the service(s) will have a measurable and beneficial health outcome, and are therefore not considered experimental;
- Consistent with Optum's best practice guidelines;
- Clinically appropriate for the member's behavioral health conditions based on generally accepted standards of clinical practice and benchmarks.[20]

Next, the LOCG's provide common criteria for receiving continued services for all levels of care. They require that "[t]he admission criteria continue to be met and active treatment is being provided. For treatment to be considered 'active', service(s) must be … reasonably expected to improve the member's presenting problems within a reasonable period of time."[21]

Lastly, the common discharge criteria for all levels of care require that:

[t]he continued stay criteria are no longer met. Examples include:

- The factors which led to admission have been addressed to the extent that the member can be safely transitioned to a less intensive level of care, or no longer requires care.
- Treatment is primarily for the purpose of providing social, custodial, recreational, or respite care.[22]

In addition to the common criteria to all levels of care, the LOCG's provide specific criteria for Residential Treatment Center services. The admission criteria for RTC care are as follows:

---

[18] In the 2019 LOCG's, "current" is omitted. Rec. 624.

[19] In the 2019 LOCG's, the phrase states "Services are medically necessary defined as." Rec. 624.

[20] Rec. 596, 610, 624.

[21] Rec. 596, 610, 625.

[22] Rec. 596, 610, 625.

4

The factors leading to admission cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive level of care due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors. Examples include the following:[23]

- Acute[24] impairment of behavior or cognition that interferes with activities of daily living to the extent that the welfare of the member or others is endangered.
- Psychosocial and environmental problems that are likely to threaten the member's safety or undermine engagement in a less intensive level of care without the intensity of services offered in this level of care.[25]

Lastly, the LOCG's criteria for continued care at an RTC provide that:

Treatment is not primarily for the purpose of providing custodial care. Services are custodial when they are any of the following:

- Non-health-related services, such as assistance in activities of daily living (examples include feeding, dressing, bathing, transferring, and ambulating);
- Health-related services provided for the primary purpose of meeting the personal needs of the patient or maintaining a level of function (even if the specific services are considered to be skilled services), as opposed to improving that function to an extent that might allow for a more independent existence;
- Services that do not require continued administration by trained medical personnel in order to be delivered safely and effectively.

If a member disagrees with an initial coverage determination, the Plan provides an internal grievance process.[26] A member is allowed to file a grievance to "express dissatisfaction with [United's] administration" and present written or oral communication before a committee. Following the review of the grievance, the committee will send "a written notification of the committee's decision."[27] If a member disagrees with the review of the grievance, a member

---

[23] In the 2019 LOCG's, this paragraph was rephrased as follows: "Safe, efficient, effective assessment and/or treatment of the member's condition requires the structure of 24-hour/seven days a week treatment setting. Examples include the following:" Rec. 637.
[24] In the 2019 LOCG's, "acute" is omitted. Rec. 637.
[25] Rec. 605, 618, 637.
[26] Rec. 47–48, 240–241, 439–440.
[27] Id.

"may be entitled to request an external review after exhausting [the] internal grievance procedure."[28] External reviews are performed by an "Independent Review Organization (IRO)," which reviews the claim as new "and not be bound by any decisions or conclusions reached by [United]."[29] Once the external review is completed, "the IRO will deliver notice of the final external review decision," which "will include the clinical basis for the determination."[30] The Plan states that a member cannot bring any legal action until the internal grievance process is completed.[31]

*Pertinent Medical History*

E.Z.'s volatile behavior began during elementary school.[32] What began as a struggle with drooling and negative self-image escalated to self-harm, hitting, choking, scratching, and pulling hair.[33] This in turn further escalated into a pattern of suicidal ideation, destructive behavior, and threats to do bodily harm.[34] As early as 2013, E.Z.'s suicidal threats required police intervention.[35] Such intervention, even early on, was significant. For example, the 2013 incident required police to pin down E.Z., but this did not dissuade him from reaching for an officer's handgun.[36] From 2014–2017, police arrested E.Z. numerous times on counts ranging from the sexual assault of a child to terrorist threats. In the same span of time, E.Z. was placed in medical

---

[28] *Id.*
[29] Rec. 48, 241, 440.
[30] Rec. 49, 242, 441.
[31] Rec. 61, 255, 454. *See id.* ("You cannot bring any legal action against us to recover reimbursement until you have completed all the steps in the appeals process. The internal grievance process may be deemed exhausted per 45 C.F.R. 147.136(b)(2)(ii)(F). . . . After completing that process, if you want to bring a legal action against us you must do so within three years of the date we notified you of our final decision on your appeal.")
[32] Rec. 1077.
[33] Rec. 1078.
[34] Rec. 1082–83.
[35] Rec. 1218.
[36] Rec. 1229.

or correctional facilities six times after doing things such as chasing his mom with knives and a hammer, threatening to blow up his school, hitting his mom, and attempting to break into his dad's gun safe so that he could harm himself.[37]

E.Z.'s history of sexual misconduct in the administrative record similarly demonstrates a pattern of escalation and disregard for authority. His inappropriate behavior began with attempts to kiss girls without their consent.[38] E.Z. would also put his hands down his pants in front of others frequently.[39] He then began targeting vulnerable individuals. On one occasion, he invited a six-year-old girl to watch pornography.[40] On another, E.Z. sexually assaulted a girl with special needs because he thought that she would not report him.[41] His subsequent arrest and release did not dissuade him from targeting other girls with special needs.[42] E.Z. also targeted individuals who did not have special needs. For example, E.Z. would touch his teachers' toes, legs, and arms even after they set boundaries.[43] In the summer of 2017, E.Z. was removed from a summer program for children with special needs after he was accused of "sexually touching two female

---

[37] Rec. 1221, 1688.

[38] Rec. 1548.

[39] Rec. 1548–49,

[40] Rec. 1139, 1082, 1548.

[41] Rec. 1139, 1082, 1549.

[42] Rec. 1549. In July of 2016, "[h]e was once again accused by a girl who suffered from mental handicaps. She stated that there had been several instances of [E.Z.] touching her inappropriately. At first, [E.Z.] said that he did not do it, but then later told [E.Z.'s stepmother] that he had done so. He also told [his mom] that it was not even that big of a deal because he was just trying to tickle the girl. He was again arrested." *Id.* Additionally, E.Z.'s summer program for adolescents with special needs had to expel him for (among other things) "intentionally wearing goggles and swimming between their legs while looking up." Rec. 1184, 1552.

[43] "E.Z. had problems keeping his hands to himself. He would touch teachers' arms and toes even after clear boundaries were set." Rec. 1550. The inappropriate touching also involved family. His stepmom explained to E.Z.'s therapist in 2017 that she was uncomfortable in the way he looked at her and touched her. Rec. 1183. His inappropriate touching and gawking were "ongoing concerns at home." Rec. 1186. E.Z. also inappropriately touched an 18-year-old woman at a neighbor's pool. Rec. 1183, 1553. Feeling uncomfortable, she asked him to stop and then exited the pool. E.Z. followed her out and started touching her leg, asking her to get back in. *Id.* She then notified her mom and E.Z.'s parents that she would not swim if E.Z. was also swimming. *Id.*

college students" who were counselors.[44]

E.Z. also disregarded strangers' boundaries. Beginning in 2016, he started making attempts to view pornography in public spaces. For example, he viewed pornography at a Verizon store while his parents were talking with a store employee.[45] He also had issues putting his hands down his pants while in public.[46] When his dad confronted him about his behavior, E.Z. would explain that nothing was going to stop him from doing what he wanted to do.[47] His family and mental health specialists recognized that his risk of sexual misconduct was a constant and increasingly urgent concern.[48]

E.Z.'s family tried many different treatment avenues to help him control his behavior. He has been hospitalized at least four different times,[49] was admitted to a residential treatment facility,[50] has been treated by numerous therapists—including in-home therapy,[51] and has completed many psychological evaluations.[52] A 2015 evaluation determined that, in light of emerging safety concerns, he "likely requires more intensive behavioral programming built into his school day as well as . . . in [a] home setting."[53] The evaluation concluded that "residential settings . . . may need to be considered" in light of these concerns.[54] Another evaluation

---

[44] E.Z.'s summer program director called his therapist, explaining that she was concerned for the safety of her staff. Rec. 1184. E.Z. had repeatedly inappropriately touched two college-aged female staff members and then would run away. Rec. 1184, 1552. He did not listen to staff and the program did not have the resources to constantly chase him down. Rec. 1184.
[45] Rec. 1233.
[46] Rec. 1080, 1233.
[47] Rec. 1233.
[48] Rec. 1235.
[49] E.Z. was hospitalized on two different occasions in 2013, once in 2015, and once in 2017. Rec. 1286.
[50] Rec. 1085–86. The "YTC" facility.
[51] Rec. 1144.
[52] Rec. 1688.
[53] Rec. 1144.
[54] *Id.*

determined that if in-home therapy with a specialist did not make an improvement "residential treatment is strongly recommended to provide a comprehensive and consistent environment with consistent expectations and consequences."[55] E.Z.'s parents did not see any meaningful improvement.[56] Even in the rare occasion that his family saw some improvement made, it was fleeting.[57] E.Z. would regress to his prior behavior within a few weeks.[58]

*Admission to Northwest*

E.Z. required police intervention regularly and with increasing frequency and severity in the months leading up to E.Z.'s admission to Northwest Passage ("Northwest"), a facility that provides 24-hour residential care. From May until August 2017, E.Z. threatened to commit suicide at school (requiring police intervention), threatened to kill his brother at school, and had multiple violent episodes directed at his mom and brother.[59] In late August 2017, E.Z. "greeted [his mom] at the front door with a butcher knife."[60] When she ran, E.Z. threw the knife at her.[61] E.Z.'s mom then locked herself in her car. Despite already having a few paring knives in his hands, E.Z. picked up a hammer and threw it at the car.[62] After the incident, he was hospitalized and also charged with negligent handling of a weapon and disorderly conduct with the use of a dangerous weapon.[63] After a week of evaluation, the treatment team determined "that there was

---

[55] Rec. 1155.
[56] *E.g.*, Rec. 1221–27, 1077–1088.
[57] *Id.*
[58] *Id.*
[59] Rec. 1087.
[60] Rec. 1230. This was the second incident in the last few weeks that involved a knife. During the same summer, E.Z. ran away from home, requiring his mom to go search for him while his brother stayed home. While she was away, E.Z. returned, grabbed a large knife, and told his brother that he was going to kill his mom. His brother immediately texted his mom to call 911 and fled to a neighbor's house. E.Z. eventually calmed down while home alone. Rec. 1087.
[61] Rec. 1230.
[62] *Id.*
[63] Rec. 1087, 1227.

nothing medically wrong with [E.Z.] that would be causing the problems" and released him.[64]

Days later, E.Z. was caught viewing pornography at a Verizon store.[65] His parents and at-home therapist confronted him during his scheduled visit at his dad's house, sending E.Z. into a tailspin. His tantrum resulted in significant destruction to property. His family called the police to intervene and E.Z. was booked into the county jail for a few days.[66]

Having exhausted other treatment options, E.Z.'s family admitted him to Northwest on September 11, 2017, for a full neuropsychological evaluation.[67] Notably, during the evaluation, E.Z. expressed suicidal ideation and "was placed on suicide precautions numerous times [after] . . . making suicidal threats when emotionally dysregulated."[68] However, "once these acute situations had passed . . . [E.Z.] denied any lasting or chronic suicidal ideation . . . [denying] a history of or current self-harm or homicidal ideation."[69]

The examiner, Dr. Christopher Lepage, communicated with E.Z.'s former caretakers and therapists, determining that "each informant indicated clinically significant concern regarding externalized disruptive behavior.[70] This includes patterns such as restlessness, over-activity, impulsivity, aggression, defiance, and rule breaking behaviors."[71] Dr. Lepage also considered E.Z.'s behavioral and medical history, noting that E.Z. had a history of self-harm (hitting, pulling hair, choking, scratching) and "episodes of out of control behavior at home[.] E.Z. sought

---

[64] Rec. 1087.
[65] Rec. 1087.
[66] Rec. 1087, 1218, 1221.
[67] Rec. 653, 1288, 1290. Records indicate that the assessment lasted from 9/11/2017 to 10/10/2017, involving multiple clinical interviews with E.Z. and his family as well as consultations from direct care staff. Rec. 1229.
[68] Rec. 1300.
[69] Rec. 1229.
[70] Rec. 1247.
[71] Rec. 1247.

weapons to threaten others . . . . Currently, episodes are increasing both in terms of frequency (now daily) and intensity."[72] The Master Treatment Plan noted four diagnoses: intellectual developmental disorder, attention-deficit/hyperactivity disorder, "other specified depressive disorder [DSM5 311(F32.89)]," and "other specified disruptive, impulse-control, and conduct disorder [DSM5 312.89 (F91.6)]."[73]

Dr. Lepage recommended that "E.Z. reside in a stable, structured environment that can hold him accountable . . . while also considering his cognitive and emotional weaknesses. Maintaining his safety and that of those around him while also protecting [E.Z.] from the legal consequences of his actions will be crucial."[74] Dr. Lepage concluded that E.Z. "will require more than formal clinical services scattered throughout his week. He requires an environment that can implement therapeutic interventions consistently."[75] He also expressed concern about E.Z.'s ability to improve at home.[76] Due to E.Z.'s complex living situation due to his parents' divorce, E.Z. was exposed to different parenting styles. This lack of consistency likely exacerbated his behavioral issues.[77]

The evaluation also noted that "there is an emerging concern for his perception and awareness of sexuality and how to react to sexualized thoughts and feelings. Given the known history of behavioral concern in this area (sexual touching) especially with poor impulse control, and potential reduced empathy and concern for the welfare of his peers and even caretakers, this

---

[72] Rec. 1286.
[73] Rec. 1290.
[74] Rec. 1234.
[75] *Id.*
[76] *Id.*
[77] Rec. 1234–35. The evaluation noted that implementing the consistency that E.Z. required would be incredibly difficult in a dual-home situation. Rec. 1234.

topic should be considered in treatment."[78] Dr. Lepage determined that E.Z.'s condition was appropriate for admission to Northwest's RTC unit.[79] E.Z.'s family decided to admit E.Z. into Riverside, a division of Northwest that provides residential treatment.[80]

### Care at Northwest

In E.Z.'s master treatment plan, Northwest set three "Long Term/Discharge/Graduation Goals:" (1) decrease emotional dysregulation, (2) improve healthy relationships, and (3) increase community safety.[81] To meet this long-term goals, short-term goals were also set such as being able to "[v]erbalize the intensity of suicidal ideation" and learning "distress tolerance skills to manage distressing emotions in ways other than physical or verbal aggression."[82] The master plan also set goals to create a "safety plan for home visits," and implement therapeutic care at home.[83] The plan noted that a major discharge transition obstacle would be "his ability to maintain safe behaviors."[84]

Over the next several months, E.Z. frequently expressed suicidal ideation at Northwest.[85] Professionals focused on the goal of progressing to the point where home visits could be possible

---

[78] Rec. 1247.

[79] Rec. 1289.

[80] Rec. 1288.

[81] Rec. 1298.

[82] Rec. 1298.

[83] Rec. 1298.

[84] Rec. 1291.

[85] *See* October 17, 2017 Progress Note, Rec. 1300 ("[E.Z.] placed on strict suicide precautions."); October 20, 2017 Progress Note, Rec. 1301 ("E.Z. is lowered to minimal suicide precautions."); October 2, 2017 Progress Note, Rec. 1303 ("Continue with suicide assessments until [E.Z.] is able to maintain safe behavior . . . Suicide risk: thought with specific plan and intent."; November 15, 2017 Progress Note, Rec. 1310 ("Suicide Risk: Thought with specific plan and intent."); November 28, 2017 Progress Note, Rec. 1314 ("He reports that he will kill himself by getting a fork and ripping his wrists open . . . he wants to punch his primary and . . . intends to follow through if given the opportunity."); December 4, 2017 Progress Note, Rec. 1317 ("He is continuing to actively try to open up the veins in his wrist by scratching and biting."); December 27, 2018 Progress Note, Rec. 1322 ("Suicide Risk: Thoughts with specific plan but no intent.").

without a significant regression.[86] From October to February 2018, E.Z. showed improvement in his levels of participation in group therapy,[87] but also had many incidents requiring physical intervention.[88] The frequency of these incidents decreased significantly in February 2018.[89] The only reported incident during the month occurred on February 23, 2018. E.Z. kicked and threatened to kill a staff member, requiring staff to put him into a safety hold.[90]

E.Z.'s therapist explained to his parents that E.Z.'s problematic behaviors were decreasing within the RTC environment and hoped that this progress would transfer back home.[91] To that end, care would be centered on having successful home visits to verify when a safe transfer home would be feasible.[92] However, as of February 21, E.Z.'s therapist stated that "she has not thought about discharge plans and E.Z. is not ready for discharge."[93]

E.Z.'s case manager at Northwest reported in March 2018 that while he only needed one physical intervention in February, E.Z. still used the "observation room" to kick and hit walls, yell, and destroy items.[94] Despite improvement in his participation in school and activities, his

---

[86] Rec. 1346. "Therapist . . . explain[s] that . . . we are seeing behaviors decrease in our setting which we hope to transfer back home. Therapist discussed that moving forward this is where we will see if the progress he's making here will transfer to their environment with home visits." *Id.*

[87] Rec. 1352–1367.

[88] Rec. 1368–1442.

[89] *See* Northwest Passage Physical Intervention Reports: Rec. 1372 (October 24, 2017); Rec. 1369 (October 25, 2017); Rec. 1374 (October 25, 2017); Rec. 1378 (October 27, 2017); Rec. 1381 (November 5, 2017); Rec. 1384 (November 8, 2017); Rec. 1387 (November 14, 2017); Rec. 1390 (November 14, 2017); Rec. 1393 (November 16, 2017); Rec. 1396 (November 27, 2017); Rec. 1399 (November 28, 2017); Rec. 1402 (December 1, 2017); Rec. 1405 (December 2, 2017); Rec. 1408 (December 4, 2017); Rec. 1411 (December 4, 2017); Rec. 1414 (December 26, 2017); Rec. 1417 (December 27, 2017); Rec. 1420 (January 4, 2018); Rec. 1426 (January 4, 2018); Rec. 1429 (January 19, 2017); Rec. 1432 (January 21, 2018); Rec. 1435 (January 29, 2018); Rec. 1438 (January 31, 2018); Rec. 1443 (February 23, 2018).

[90] Rec. 1444.

[91] Rec. 1346.

[92] Rec. 1346

[93] Rec. 1350.

[94] Rec. 1976. The Physical Intervention Report dated April 17, 2018 noted that E.Z. "has a history of destroying items when he is in the observation room" implying that this issue presented itself throughout his treatment— including March 2018. Rec. 2474.

effort in therapy had been "back and forth."[95] For example, E.Z. "continues to work in his sexual issues workbook during therapy, but has started using parts of it for masturbation." [96] A progress note from March 5, 2018 explains that a therapist confronted E.Z. about concerns with his sexual behavior.[97]

On March 14, 2018, a therapist let E.Z.'s mom know that "he will be having an off grounds visit this weekend as long as he continues to be safe."[98] A psychiatric progress note dated March 21, 2018 reported that the visit went well and that "E.Z. is doing better."[99] However, the next note, dated March 22, 2018, indicated that he still had challenges adapting to change.[100] His therapist indicated that E.Z.'s living situation significantly changed during the prior week. The note states that "he has been struggling with peers since they are all together all of the time with the new programming."[101] He shoved a peer, breaking strict personal space rules.[102] He also became "dysregulated" after hearing that his mom and brother were going on a vacation to Seattle.[103] In response, his therapist and mom discussed the progress E.Z. had made and reminded him of his goals and incentives for off-grounds trips.[104] Two days later, E.Z. had a successful individual therapy session where he discussed the challenges with his peers and family. E.Z.'s therapist noted that E.Z. "is fully engaged in his treatment. He is beginning to have awareness as to how his emotions are triggered and is working on avoiding triggers in his day to

---

[95] Rec. 1976.
[96] Id.
[97] Rec. 2370.
[98] Rec. 2364.
[99] Rec. 1976.
[100] Rec. 2360.
[101] Id.
[102] Id.
[103] Rec. 2358.
[104] Id.

day life."[105]

From April to August 2018, E.Z. had several incidents per month requiring physical intervention.[106] E.Z. was also placed on strict suicide precautions a number of times from April until August after expressing varying degrees of suicidal ideation.[107] During this time, he made some improvements but never sufficient to allow a prolonged stay at home.[108] For example, after a short home visit, E.Z.'s therapist explained to E.Z.'s mom that her house was "very dysregulated this week . . . and that she feels like [E.Z.'s] suicidal comments were influenced by his environment [during his visit at home]."[109]

In a progress note on June 13, 2018, a therapist reported that programming has "the minimum requirement to be safe" and that his team would "advocate for him to have more freedom if he is safe."[110] Later in the month his therapist confronted E.Z. again "on his poor sexual and physical boundaries around campus."[111]

In July, E.Z. was placed back on strict suicide precautions after scratching his arms and

---

[105] Rec. 2356.

[106] See Northwest Passage Physical Intervention Reports: Rec. 2473 (April 13, 2018); Rec. 2471 (April 24, 2018); Rec. 2468 (May 16, 2018); Rec. 2465 (May 17, 2018); Rec. 2462 (May 18, 2018); Rec. 2459 (May 18, 2018); Rec. 2456 (June 1, 2018); Rec. 2453 (June 6, 2018); Rec. 2450 (July 4, 2018); Rec. 2447 (July 6, 2018); Rec. 2444 (July 17, 2018); Rec. 2441 (July 18, 2018); Rec. 2438 (July 19, 2018); Rec. 2435 (August 22, 2018).

[107] Rec. 2344 (On April 24, 2018, E.Z. was placed back on strict suicide precautions after he articulated a thought with a specific plan and intent); Rec. 2459 (On May 18, 2018, E.Z. was placed on strict suicide precautions); Rec. 2452 (On June 9, 2018, E.Z. was placed on strict suicide precautions); Rec. 2642 (On July 6, 2018, case manager reported to parents that E.Z. was placed on strict suicide precautions); Rec. 2316 (On July 9, therapist noted that he remained on strict suicide precautions); Rec. 2313 (On July 12, 2018, therapist noted that due to impulsive behaviors, E.Z. was placed on strict suicide precautions); Rec. 2437 (On July 19, 2018, E.Z. was placed on strict suicide precautions); Rec. 2646 (On, July 20, 2018, E.Z. articulated suicidal thoughts with a specific plan); Rec. 2308 (On July 23, 2018, therapist noted that he remained on strict suicide precautions due to him articulating specific plan); Rec. 2304 (On July 26, 2018, therapist reported that E.Z. will remain on strict suicide precautions during the week due to being in an "escalated state of dysregulation"); Rec. 2299 (on August 2, 2018, therapist notes that E.Z. was completely removed from suicide precautions).

[108] Rec. 2342, 2338, 2335.

[109] Rec. 2342.

[110] Rec. 2325.

[111] Rec. 2320.

wrists and expressing suicidal ideation.[112] Later in the month, a progress note reported that "NWP [Northwest] is not discussing discharge for [E.Z.]" and that he will miss out on opportunities "because he is being unsafe."[113] On July 19, E.Z. threw his shoes at staff.[114] The staff members exited the room and he started kicking and punching the door, triggering a physical intervention.[115] E.Z. started calling staff members highly offensive slurs and tied a sweatshirt around his neck.[116] He bit, scratched, kicked, and spit on staff.[117] He remained on strict suicide precautions until July 30, 2018.[118]

On August 3 and 10, E.Z. went on overnight weekend visits home.[119] His parents reported that the August 3rd visit went well overall and that they all noticed a positive difference in E.Z.'s behaviors.[120] However, he stole his dad's phone to view pornography and attempted to sneak out.[121] Later in the week, his therapist had to discuss "poor boundaries that [E.Z.] has had both in programming and on his home visits."[122]

The August 10th visit went better. His mom reported that it "went very well and that she can see maturity in [E.Z.]."[123] During the visit, his mom talked with E.Z. about transitioning from Northwest.[124] Staff let E.Z. know that Northwest "is unsure what their recommendation

---

[112] Rec. 2316.
[113] Rec. 2310.
[114] Rec. 2438.
[115] *Id.*
[116] *Id.*
[117] *Id.*
[118] Rec. 2303.
[119] Rec. 2655–60.
[120] Rec. 2295.
[121] *Id.* In January, E.Z. and his therapist identified pornography use at his dad's house as a trigger for E.Z.'s negative behavioral cycle. Rec. 1346.
[122] Rec. 2295.
[123] Rec. 2293.
[124] *Id.*

would be at this time." Later in the month, E.Z. had a discussion about transitioning to day treatment. E.Z. believed that a quick transition from treatment at Northwest would not be good for his progress and that he "would be unsafe."[125] The progress note says that "E.Z. continues to show dysregulation when he chooses, though he is handling his frustrations much more appropriately than when he had come to N[orthwest]."[126] Days later, his therapist wrote that she helped E.Z. "to stay mindful on his treatment and that we are not transitioning just yet. [We] [d]iscussed the poor boundaries that [E.Z.] has had both in programming and on his visits."[127]

On August 22, 2018, E.Z. became escalated and started punching his bed and the walls of his room. He then started making threats to harm peers and staff, triggering a physically enforced separation due to his actions posing an imminent danger of harm to others.[128] However, days later, staff told E.Z. about "the plan for him to attend another placement instead of going home following NWP."[129] E.Z. was "overjoyed to have answers and a discharge date, even if that discharge date is a ways out."[130]

A progress note dated September 10, 2018, reported that a visit home the prior weekend went poorly. The therapist explained "the reasons why going home right now would be detrimental." She also "[d]iscussed the damage that E.Z. did to [his] relationship [with his brother] due to his behaviors at Mom's house."[131] On September 12, 2018, E.Z.'s mom notified the therapist that she was "willing to allow E.Z. to come live at home and that [E.Z.'s dad] is

---

[125] Rec. 2283.
[126] Rec. 2287.
[127] Rec. 2293.
[128] Rec. 2435.
[129] Rec. 2285.
[130] *Id.*
[131] Rec. 2277.

attempting to have her sign documentation that states that she will not take [E.Z.] back in the home until he is 18 years old."[132] During the session, E.Z. stated that he was struggling because his peers were going to be discharged soon and he would not. The therapist assessed that E.Z. "does a great job opening up to his mom about his manipulative behavior and provides insight to them as well. [E.Z] is acknowledging that he has the capacity to care for himself."

*First Denial of Benefits*

The court now turns to E.Z.'s claims processing interactions with United. The procedural history is complex. United initially authorized coverage at Northwest in small, 2–6 day increments.[133] In a letter dated September 26, 2017, United denied payment for E.Z.'s treatment from September 25 forward.[134] The letter stated that "Based on the UBH Level of Care Guideline for the Mental Guideline for the Mental Health Residential Treatment Center Level of Care and the UBH Common Criteria and Clinical Bast Practices for All Levels of Care Guidelines, it is my determination that no further authorization can be provided from 9/25/2017."[135] In explaining the rationale for the decision, the letter stated the following:

> Your child was admitted for an extended evaluation of his symptoms. After talking with your provider's designee, it is noted that his evaluation is complete. No additional medication changes are planned. His condition no longer meets Guidelines for further coverage of treatment in this setting. The information provided showed that at this time he is not a danger to self or others. You [sic] did not have serious medical or mental health symptoms that require 24-hour monitoring. He continues to have challenges but does not need the structure of Residential Treatment. Care can continue in a Mental Health Outpatient setting.[136]

---

[132] Rec. 2275.
[133] Rec. 812–824. United approved treatment from 9/11/17–9/14/17 on 9/13/17, then from 9/15/17–9/21/17 on 9/15/17. It then approved a single day of coverage on 9/22/17. Rec. 820. Lastly, United approved coverage for treatment from 9/23/17–9/24/17 retroactively on 9/26/17. Rec. 824.
[134] Rec. 1504.
[135] *Id.*
[136] *Id.*

*E.Z.'s Parents Appeal United's Denial of Coverage from September 2017 Forward*

On March 19, 2018, E.Z.'s family submitted a level one appeal of the September 26, 2017 decision.[137] They argued that United wrongly concluded that "E.Z. is not a danger to self or others" and that despite the determination, he required the structure of an RTC. E.Z.'s parents also contended that care at Northwest was medically necessary because other, less structured therapies did not help E.Z. control his violent, manipulative, or sexual behavior.[138] E.Z.'s parents contended that without treatment at an RTC like Northwest, he would have been a danger to himself and to others, given how he behaved prior to and since being admitted.[139] The appeal contained extensive medical documentation from hospitals, doctors, and therapists as well as police reports to support the arguments.[140] However, the appeal did not include any records postdating February 2018.[141]

In addition to the argument that RTC care was medically necessary, E.Z.'s parents also contended that United violated the Parity Act when it allegedly imposed a non-quantitative treatment limitation on his mental health treatment that United did not apply to comparable medical or surgical treatment.[142] They also argued that United's RTC LOCG's were contradictory, allegedly requiring a person to not be an imminent risk of harm to self or others while also allowing coverage where a person is experiencing "acute impairment of behavior or cognition . . . to the extent that the welfare of the member or others is endangered."[143]

---

[137] Rec. 1538–1950.
[138] *See* Rec. 1554–1559.
[139] Rec. 1559.
[140] Rec. 1580–1950.
[141] Rec. 1229–59, 1283–1482.
[142] Rec. 1559.
[143] Rec. 1561–62.

*United Considers Treatment after March 20, 2018 as a New Episode of Care*

When E.Z.'s parents sent the appeal to United, a procedural issue was discussed internally. Internal notes explain the procedure: the period from "[d]enial to appeal receipt is treated as [a] standard appeal and from [the] receipt forward is treated as urgent concurrent request for services."[144] Thus, the period from denial, beginning on September 24, 2017 until United's receipt date of the appeal, March 20, 2018, was treated as a "standard appeal."[145] The period after March 20, 2018, was treated as an "urgent concurrent request for services."[146] As a result, United let the Northwest case manager know that treatment from March 21, 2018 forward would be considered a new request for services.[147] United has not indicated that it informed Plaintiffs about this procedural distinction in the prelitigation administrative record.

*United Denies Coverage for the New Episode of Care*

On April 11, 2018, United denied coverage for the period starting March 21, 2018.[148] The denial letter stated, in pertinent part:

> Benefit coverage of Residential Level of Care is not available on 03/21/2018 and forward. This is based on Optum Level of Care Guidelines for Residential Treatment of Mental Health Disorders and the Optum Common Criteria and Clinical Best Practices for All Levels of Care Level of Care Guidelines. The symptoms that caused your child to be admitted have improved. He no longer appears to require 24-hour care. He is cooperative on the unit. He has gained insight during over five months of Residential care. He appears to be able to continue work on his recovery at a day program. They are available in his area. This would be covered. This would allow more family involvement in his continued care.[149]

---

[144] Rec. 1486; Rec. 177.

[145] *Id.*

[146] *Id.*

[147] Rec. 736. "Manager . . . requested Care Advocate Outreach to process this member's treatment as a new episode of care as of 3/21/18 and review for Medical Necessity. Backdate if criteria is met. Outreach to [Utilization Review] to obtain clinical 3/21/18 forward per manager request." *Id.* "Manager" refers to a UBH employee. Rec. 738–739.

[148] Rec. 1996.

[149] Rec. 1996–1997.

*United Requests Medical Records from March 21, 2018 Forward*

United's internal records indicate that a representative requested medical records post-dating February 2018.[150] United received those records on April 9, 2018.[151]

*United Responds to the Level 1 Appeal*

In a letter dated April 17, 2018, United's Appeals & Grievance Panel partially overturned the initial denial of treatment coverage.[152] It states, in pertinent part that "benefit coverage is partially available for the following reasons:"

> Your child was admitted needing more intensive monitoring and therapy. After reviewing the medical records, he made progress and no longer needed the type of care provided in this setting. He was medically stable. He was not having thoughts to harm himself or others. He participated in treatment. There was no other clinical information provided to support the medical necessity for ongoing treatment in a 24-hour/day setting. . . . Based on our Level of Care Guideline for Mental Health Residential Rehabilitation Level of Care, it is my determination that no further authorization can be provided from 3/01/2018 forward.[153]
>
> . . .
>
> This determination does not mean that your child did not require additional health care, or that your child needed to be discharged. Decisions about continuation of treatment should be made by you and your child's provider. The purpose of this letter is to inform you that, based on its review of the available information, the Grievance Review Panel has determined that coverage is available under your benefit plan for your child's continued stay at Northwest Passage for the dates of service . . . 9/25/2017 through 2/27/2018 and that coverage is not available for the dates of service 3/01/2018 forward. [154]

*Independent Review of the Denial of Benefits from March 1, 2018 to March 20, 2018*

---

[150] Rec. 1486.
[151] *Id.*
[152] Rec. 1533–34.
[153] Rec. 1533–34.
[154] Rec. 1534.

In a letter dated May 28, 2018, E.Z.'s parents requested an external, independent review of United's decision to deny coverage from March 1 to March 20, 2018.[155] United assigned an independent organization to conduct the external review, which took place on July 5, 2018.[156] The panel reviewed the materials sent in the internal appeal in addition to the supplemental medical documents dated through March 21, 2018 and "BH Case Notes" dated through April 16, 2018.[157] The panel upheld United's decision to deny benefits.[158] In the explanation of findings, the panel quoted the relevant Optum LOCG's for RTC Continued Service Criteria and provided the panel's conclusion of whether a particular element was met by writing "MET" or "NOT MET" as follows:

Residential Treatment Center Continued Service Criteria

- See Common Continued Service Criteria for All Levels of Care - (NOT MET) AND
- Treatment is not primarily for the purpose of providing custodial care. Services are custodial when they are any of the following: (NOT MET)
    - Non-health-related services, such as assistance in activities of daily living (examples include feeding, dressing, bathing, transferring, and ambulating);
    - Health-related services provided for the primary purpose of meeting the personal needs of the patient or maintaining a level of function (even if the specific services are considered to be skilled services), as opposed to improving that function to an extent that might allow for a more independent existence; - (MET)
    - Services that do not require continued administration by trained medical personnel in order to be delivered safely and effectively.[159]

The panel then explained its decision, in pertinent part, as follows:

The 3/21/18 provider progress note documented . . . that "E. is doing better." He

---

[155] Rec. 1528, 1988.
[156] Rec. 4826. Medical Review Institute of America, LLC conducted the review. *Id.*
[157] Rec. 4837–38. The acronym is assumed to mean Behavioral Health, as in United Behavioral Health's internal case notes.
[158] Rec. 4837.
[159] Rec. 4838–37 (formatting cleaned up).

had only one physical intervention to prevent aggression and this took place in February 2018 and none since then. The patient denies suicidal and homicidal ideation. He is not engaged in potentially life threatening self-injurious behaviors, and is not psychotic. He is able to do activity of daily living. (ADLs).

…

From 3/1/18-3/20/18 the patient denied suicidal and homicidal ideation, and was not self-harming, psychotic, aggressive, or unable to do ADLs. These are the criteria that are recommended by the Optum guidelines to support continued mental health residential treatment. The patient was medically stable and tolerating the medication without significant untoward side effects. As a result, the patient's treatment could have taken place in a less restrictive setting, which would have been more appropriate for treatment, such as a partial hospitalization program (PHP), on the dates of service in question.[160]

### E.Z.'s Parents Appeal the New Treatment Episode Decision

On September 26, 2018, E.Z.'s parents submitted a second level one appeal, challenging United's initial decision to deny benefits after March 20, 2018. E.Z.'s parents included medical documents dated through September 12, 2018. They contended that because E.Z. still struggled with suicidal ideation and violent outbursts after March 20 and because his "treating professionals agree[d] that his subacute level of care [was] necessary," United should reverse its decision that his treatment was not medically necessary.[161]

### United Partially Overturns the New Treatment Episode Decision

In a letter dated October 16, 2018, a United panel upheld the denial of payment from August 10, 2018 forward, but overturned the prior denial of care from March 21 to August 9, 2018.[162] In denying future coverage, United explained:

Your child was admitted for treatment of mood and behavioral concerns. After reviewing the available information, it is noted your child had made progress and

---

[160] *Id.*
[161] Rec. 2012–29.
[162] Rec. 2763–64.

that his condition no longer met Guidelines for further coverage of treatment in this setting. Your child had made further continuing improvements. He was cooperative, responsive to staff, and doing better. He was adherent with all aspects of his treatment plan. He presented no serious acute behavioral management challenges. There was no suicidal or self-harm thinking; no self-harmful behaviors were reported. He posed no risk of harm to others - he was not homicidal, assaultive, combative, or destructive. His thinking was more positive. The member had no bizarre beliefs and was not hallucinating. His mood was improving and more stable. He was developing coping skills and using them. Self control was improving. Self-care appeared adequate. There were no concerning medical issues. Likely expectable residual features of his condition remained and were not of a serious intensity. You were supportive and involved. Family work was progressing. Your child had a successful pass with you. Your child no longer appeared to need 24-hour around-the-clock care. Given progress, your child could have continued care in the Mental Health Partial Hospitalization Program or Intensive Outpatient Program setting.[163]

*Procedural Posture*

Plaintiffs filed their Complaint on April 2, 2021.[164] On June 22, 2021, the parties filed a stipulated motion to stay the case to address Plaintiffs' allegation that Defendants did not provide all of the requested Plan documents.[165] On November 19, 2021, the stay was lifted.[166] On December 6, 2021, Plaintiffs filed their Amended Complaint.[167] Defendants filed their Answer on December 27, 2021.[168] In March 2023, the parties filed cross Motions for Summary Judgment, which were fully briefed in June 2023.[169]

**STANDARD**

---

[163] Rec. 2764.
[164] Compl., ECF No. 2.
[165] Mot. to Stay Case, ECF No. 15, filed June 22, 2021.
[166] November 23, 2018 Docket Text Order, ECF No. 23.
[167] Am. Compl., ECF No. 26, filed Dec. 6, 2021.
[168] Answer, ECF No. 27, filed Dec. 27, 2021.
[169] Defs.' MSJ; Pls.' MSJ; Defs.' Reply in Further Supp. of Their MSJ ("Defs.' MSJ Reply"), ECF No. 97, filed June 14, 2023; Pls.' Reply in Supp. of Their MSJ ("Pls.' MSJ Reply"), ECF No. 98, filed June 14, 2023.

Under Federal Rule of Civil Procedure 56, summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[170] "Where, as here, the parties in an ERISA case both moved for summary judgment . . . , summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."[171]

## DISCUSSION

The parties move for summary judgment on two issues: United's denial of benefits at Northwest Passage ("Northwest") and Plaintiffs' Parity Act claim. The court discusses each in turn.

## I.    Denial of Benefits Claim

### A.    Standard of Review

Under 29 U.S.C. § 1132(a)(1)(b), a civil action may be brought by an insurance plan participant to recover benefits under the terms of the plan. The Supreme Court has held that "a denial of benefits challenged under [ERISA] must be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[172]

---

[170] Fed. R. Civ. P. 56(a).
[171] *Carlile v. Reliance Standard Life Ins.*, 988 F.3d 1217, 1221 (10th Cir. 2021) (cleaned up).
[172] *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Foster v. PPG, Inc.*, 683 F.3d 1223, 1231 (10th Cir. 2012).

Where the plan administrator has discretionary authority, the courts "apply a deferential standard, affirming the decision unless it is arbitrary and capricious."[173] Defendants carry the burden to demonstrate that the arbitrary and capricious standard applies.[174] Courts will uphold the administrator's determination "so long as it was made on a reasoned basis and supported by substantial evidence."[175] "Substantial evidence requires more than a scintilla but less than a preponderance."[176] Substantial evidence is "'such evidence that a reasonable mind might accept as adequate to support a conclusion reached by the decision-maker.'"[177]

"In determining whether the evidence in support of the administrator's decision is substantial, [courts] must take into account whatever in the record fairly detracts from its weight."[178] Plan administrators may not arbitrarily refuse to engage with a claimant's reliable evidence—including the opinions of a treating physician.[179] However, "a benefits decision can be reasonable even when the insurer receives evidence contrary to the evidence it relies upon."[180] For example, where an administrator "credits reliable evidence that conflicts with a treating physician's evaluation," courts may not require that plan administrators provide an explanation as to why the administrator favored that evidence over the physician's evaluation.[181] However,

---

[173] *L.D. v. UnitedHealthcare Ins.*, ___ F. Supp. 3d ___, No. 1:21-cv-00232, 2023 WL 4847421, at *11 (D. Utah July 28, 2023) (quoting *Niles v. American Airlines, Inc.*, 269 F. App'x 826, 833 (10th Cir. 2008).

[174] *M.S. v. Premera Blue Cross*, 553 F. Supp. 3d 1000, 1019 (D. Utah 2021).

[175] *Van Steen v. Life Ins. Co. of N. Am.*, 878 F.3d 994, 997 (10th Cir. 2018).

[176] *Graham v. Hartford Life & Acc. Ins. Co.*, 589 F.3d 1345, 1358 (10th Cir. 2009).

[177] *David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1308 (10th Cir. 2023) (quoting *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992).

[178] *David P.*, 77 F.4th at 1308.

[179] *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

[180] *David P.*, 77 F.4th at 1308.

[181] *Black & Decker*, 583 U.S. at 834. "This conclusion does not create any blanket requirement that a health plan administrator considering a claim for health care benefits must seek out all treating care givers' opinions found in a claimant's medical records and explain whether or not the plan administrator agrees with each of those opinions and why." *David P.*, 77 F.4th at 1312.

an administrator also may not arbitrarily refuse to credit evidence that may confirm a beneficiary's theory of entitlement.[182] Thus, if a treating physician's evaluation confirms a claimant's theory of entitlement, an administrator may not arbitrarily refuse to "engage and address" such an evaluation.[183] "[R]eviewers cannot shut their eyes" to reliable evidence and ignore it.[184]

Arbitrary and capricious review considers whether the decision had a reasoned basis that is supported by substantial evidence.[185] This includes whether the decision is "consistent with any prior interpretations by the plan administrator, is reasonable in light of any external standards, and is consistent with the purposes of the plan."[186] "Consistent with the purposes of the plan requirements means that a plan administrator acts arbitrarily and capriciously if the administrator 'fails to consistently apply the terms of an ERISA plan' or provides 'an interpretation inconsistent with the plan's unambiguous language.'"[187]

The arbitrary and capricious standard of review applies here because the Plan gives discretionary authority to United. The Plan grants United the authority to "Interpret Benefits and the other terms . . . [and] [m]ake factual determinations relating to Benefits."[188] The Plan also grants the authority to determine whether Covered Health Services are Medically Necessary.[189] Moreover, *Tracy O. v. Anthem Blue Cross Life & Health Ins. Co.,* held that nearly identical plan language "more than adequately grants discretionary authority to [the administrator] over

---

[182] *D.K.*, 67 F.4th at 1237 (quoting *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807 (10th Cir. 2004)).
[183] *D.K.*, 67 F.4th at 1237 (citing *Black & Decker*, 583 U.S. at 834).
[184] *David P.* 77 F.4th at 1310–11.
[185] *D.K.*, 67 F.4th at 1236.
[186] *Id.*
[187] *Id.* (quoting *Tracy O v. Anthem Blue Cross & Life Health Ins.*, 807 F.App's 845, 854 (10th Cir. 2020).
[188] Rec. 8, 200, 399.
[189] Defs.' MSJ 25; Rec. 11, 203, 402.

benefits claims and triggers arbitrary and capricious review."[190] Plaintiffs do not dispute that

United has discretionary authority.[191] Nor do Plaintiffs dispute that United is subject to the

arbitrary and capricious standard of review as to the Plaintiffs' claim for treatment at Northwest

from August 9, 2018 forward.[192] However, Plaintiffs challenge the standard of review for the

March 1 to March 20, 2018 denial of benefits.[193]

Plaintiffs contend that United's "inconsistent decision-making created confusion in the

appeals process," requiring the court to recognize "a reduction of deference to the Defendants'

decision."[194] The court disagrees that de novo review is required here. Additionally, Plaintiffs

abandoned this argument in their Reply in Support of Their Motion for Summary Judgment[195]

and in their Opposition to Defendants' Motion for Summary Judgment.[196]

B.      ERISA's Claim Processing Requirements

ERISA sets minimum requirements for employer-sponsored health plans, which may be

administered by a third party.[197] "Administrators, like United, are analogous to trustees of

common-law trusts and their benefit determinations constitute fiduciary acts."[198] Thus,

administrators owe a special duty of loyalty to plan beneficiaries in determining benefit

eligibility.[199]

---

[190] 807 Fed. App'x 845, 853 (10th Cir. 2020).
[191] Pls.' Opp'n to Defs.' Mot. Summ. J. 9–10 ("Pls.' Opp.'n"), ECF No. 88, filed May 17, 2023; Pls.' MSJ 16–17.
[192] Pls.' MSJ 16.
[193] Pls.' MSJ 16.
[194] Pls.' MSJ 16.
[195] Pls.' MSJ Reply 3–7.
[196] Pls.' Opp'n 9–10.
[197] 29 U.S.C. § 1001; *D.K.*, 67 F.4th at 1236.
[198] *Id.*
[199] *Id.* (quoting *Metro. Life Ins. V. Glenn*, 554 U.S. 105, 111 (2008)).

"ERISA promotes the interests of plan participants and beneficiaries and contractually defined benefits 'in part by regulating the manner in which plans process benefits claims.'"[200] These standards constitute the minimum requirements for a plan's claims-processing procedure.[201] The procedure, set forth in 29 U.S.C. § 1133 and in related implementing regulations, require "a meaningful dialogue between ERISA plan administrators and their beneficiaries."[202] When administrators issue denial letters, they need to explain in clear language the reason(s) for their decision.[203] "[I]f the plan administrators believe that more information is needed to make a reasoned decision, they must [clearly] ask for it," explaining why the information is needed.[204] If they deny benefits based on the text of the plan, they must cite to the specific provisions of the plan.[205] And if plan administrators deny benefits based on their scientific or clinical judgment of the claimant's circumstances, they must explain their reasoning as applied to the terms of the plan.[206]

Relatedly, ERISA sets out minimum requirements for the appeals procedure for members to challenge initial denial decisions.[207] A plan's review procedures must "'[p]rovide a reasonable opportunity to any participant whose claim for benefits has been denied [to receive] a full and fair review . . . .'"[208] ERISA's "full and fair review" creates a procedure by which claimants receive letters "knowing what evidence the decision-maker relied upon, having an opportunity to

---

[200] *Id*. at 1299 (quoting *Glenn*, 554 U.S. at 117).
[201] *Id*.
[202] *Id*. at 1300.
[203] *Id*. (quoting *Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997)).
[204] *Id*. (quoting *Booton*, 110 F.3d at 1463); *David P.*, 77 F.4th at 1299 (citing 29 C.F.R. § 2560.503-1(g)(1)).
[205] *David P.*, 77 F.4th at 1299 (citing 29 C.F.R. § 2560.503-1(g)(1)).
[206] *Id*.
[207] 29 U.S.C. § 1132(2).
[208] *D.K.*, 67 F.4th at 1236 (quoting 29 U.S.C. § 1133).

address the accuracy and reliability of the evidence, and . . . having the decision-maker consider the evidence presented by both parties to reaching and rendering [its] decision."[209] This includes providing claimants an "opportunity to submit written comments, documents, records, and other information relating to the claim for benefits" as well as conducting a "review that takes into account all . . . information submitted by the claimant relating to the claim."[210] "[A]dministrator statements may not be conclusory and any health conclusions must be backed up with reasoning and citations to the record."[211]

The court turns to Plaintiffs' arguments regarding United's alleged improper denial of benefits in violation of ERISA. Plaintiffs seek the recovery of benefits for two separate periods of time: from March 1, 2018 to March 20, 2018; and for benefits after August 10, 2018. The court addresses each period separately.

Plaintiffs argue that United failed to provide a "full and fair review" in its appeals process and failed to engage in a meaningful dialogue when it engaged in "inconsistent decision making."[212] Specifically, they allege that United's claims processing was inadequate by failing to engage with E.Z.'s treating professionals' recommendations and E.Z.'s behavioral history,[213] and by failing to adequately explain its adverse medical necessity determination.[214] Plaintiffs also argue that in addition to United's procedural deficiencies, the record clearly demonstrates that

---

[209] *Sage v. Automation, Inc. Pension Plan & Tr.*, 845 F.2d 885, 893–94 (10th Cir. 1988) (quoting *Grossmuller v. Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am., Local 813*, 715 F.2d 853, 858 n.5 (3rd Cir. 1983)).

[210] *David P.*, 77 F.4th at 1299 (quoting 29 C.F.R. § 2560.503-1(h)(2)(ii), (iv)).

[211] *D.K.*, 67 F.4th at 1242 (citing *McMillan v. AT&T Umbrella Benefit Plan No. 1*, 746 F. App'x 697, 705–06 (10th Cir. 2018) (unpublished)); *see David P.*, 77 F.4th at 1312.

[212] Pls.' MSJ 16.

[213] Pls.' MSJ 15–16; Pls.' MSJ Reply 3–6.

[214] Pls.' MSJ 21.

E.Z.'s treatment was medically necessary and United's decision to deny benefits was arbitrary and capricious.[215]

###    C.    Review of United's Claims Processing

The court first reviews United's claims processing for the March 2018 denial of benefits. As an initial matter, the court reviews what materials are considered when evaluating claims processing deficiencies.

The Tenth Circuit held that "the administrator must include its reasons for denying coverage in the four corners of the denial letter" because denial letters "play a particular role in ensuring full and fair review."[216]

In contrast, an administrator's internal notes, if not disclosed in the denial letter, cannot rectify a deficient denial letter. The purposes of ERISA's claim processing requirements "are undermined where plan administrators have available sufficient information to assert a basis for denial of benefits but choose to hold that basis in reserve rather than communicate it to the beneficiary."[217] Thus, when an administrator holds in reserve a basis for providing benefits, the administrator prevents a full and meaningful dialogue.[218]

###    1.    Failure to Address E.Z.'s Medical History and Treatment Notes

Plaintiffs argue that United's initial benefits denial letters leading up to and concerning his March 2018 treatment repeatedly made conclusory statements in contradiction to E.Z.'s care givers' opinions and his behavioral trends.[219]

---

[215] Pls.' MSJ 21–24.
[216] *D.K.*, 67 F.4th at 1236.
[217] *Id.* at 1313.
[218] *Id.*
[219] Pls.' MSJ 16, 20–21; Pls.' MSJ Reply 4, 6.

The initial denial letter dated September 26, 2017 concluded—without any explanation or reference to the record—that "at this time [E.Z.] is not a danger to himself or others . . . [he] did not have serious medical or mental health symptoms that require 24-hour monitoring."[220] United made this statement when E.Z. had a history of escalating inappropriate sexual behavior and violence.[221] This letter was only two months separated from E.Z.'s expulsion from his summer camp after he inappropriately touched guidance counselors.[222] Only one month earlier, E.Z. "greeted [him mom] at the front door with a butcher knife" and threw a hammer at her car.[223] Weeks earlier, he viewed pornography at a Verizon store and destroyed property at his dad's house.[224] The letter failed to provide an explanation as to why E.Z.'s mere evaluation at Northwest adequately addressed E.Z.'s risk of harm in light of these events.

United's internal notes and Dr. Lepage's assessment confirm that E.Z.'s safety issues had not been conclusively resolved by September 26, even though United concluded that E.Z. "no longer meets the Guidelines for further coverage . . . in this setting."[225] The record demonstrates that E.Z. expressed suicidal ideation during his initial evaluation and at least one other time on September 20, 2017.[226] Next, a peer-to-peer evaluation in United's case notes raised the concern that E.Z. "had a few boundary issues with female peers, but staff is not sure if it is sexual or just

---

[220] Rec. 1504.
[221] United's internal notes state that "he's been increasingly aggressive for some period of time." Rec. 721. Thus, even before E.Z.'s parents submitted his full medical history on appeal, United was aware of his escalating aggression.
[222] Rec. 1184–85.
[223] Rec. 1230.
[224] Rec. 1087.
[225] Rec. 1504.
[226] Rec. 1300.

trying to get attention."[227] Despite these facts, the denial letter made a definitive, unqualified conclusion that E.Z. was not dangerous with no explanation.

Moreover, E.Z.'s treatment follows years of trying lower levels of care, including in-home therapy.[228] Multiple treating professionals, including the treating physician at Northwest, concluded that E.Z. required the consistency and intensity of care that RTC treatment provides because of increasing concern about his safety and the safety of those around him.[229] Yet, the letter recommends that a lower level of care is appropriate without further explanation.[230] Apparently recognizing its error, United later overturned its prior decision and awarded benefits until March 1.[231]

Next, Plaintiffs argue that the subsequent April 11 and 17, 2018 denial letters also failed to sufficiently address E.Z.'s treatment notes and history at Northwest.[232] First, the court addresses United's initial benefits determination on April 11, 2018 for the treatment period starting March 21, 2018. Only three statements in the letter refer to E.Z.'s condition: "the symptoms that caused E.Z. to be admitted have improved," "he is cooperative on the unit," and "he has gained insight during . . . care."[233] While these may be true, the presence of these facts do not necessarily indicate that E.Z. was safe. Not when Northwest filed *24 physical intervention*

---

[227] Rec. 730.
[228] *See* 2015 Evaluation, Rec. 1144 ("residential settings . . . may need to be considered for him" if other less intensive treatment options do not improve E.Z.'s behavior.); 2016 Evaluation, Rec. 1155 ("if more comprehensive treatment with a specialist does not result in improved behavior, . . . residential treatment is strongly recommended to provide a comprehensive and consistent environment."); 2017 Evaluation at Northwest, Rec. 1234 (expressing safety concerns and determining that RTC treatment was appropriate).
[229] *Id.*
[230] Rec. 1504.
[231] Rec. 1534.
[232] Pls.' MSJ Reply 7.
[233] Rec. 1996.

*reports* in the preceding five months.[234] Moreover, E.Z. was struggling with his sexual

behavioral therapy as of March 5, 2018.[235] The existence of these facts required that United

address these concerns because they could have confirmed E.Z.'s theory for relief.

Without basic reasoning, E.Z.'s parents were denied a full opportunity to engage in a

meaningful dialogue with United to address reviewers' specific concerns in the record. This is

why denial letters must comply with basic procedural requirements.

Next, the court reviews the letter dated April 17, 2018. The letter responded to Plaintiffs'

first level one appeal by confirming the initial September 26, 2017 decision to deny benefits.[236]

The letter states that "After reviewing the medical records, he made progress and no longer

needed the type of care provided. He was medically stable. He was not having thoughts to harm

himself or others. He participated in treatment."[237] These statements are at least equally as

conclusory as the initial decisions, and it still is unclear which "medical records" United used in

making the determination. Granted, reviewers stated earlier in the letter that they examined

"UBH case notes, appeals request materials, medical record and a presentation from Mr.

Allenback, representative for the member."[238] However, this merely provides in conclusory

fashion what records were examined—not which records supported their decision. More

---

[234] *See* Northwest Passage Physical Intervention Reports: *id*. at 1372 (October 24, 2017); *id*. at 1369 (October 25, 2017); *id*. at 1374 (October 25, 2017); *id*. at 1378 (October 27, 2017); *id*. at 1381 (November 5, 2017); *id*. at 1384 (November 8, 2017); *id*. at 1387 (November 14, 2017); *id*. at 1390 (November 14, 2017); *id*. at 1393 (November 16, 2017); *id*. at 1396 (November 27, 2017); *id*. at 1399 (November 28, 2017); *id*. at 1402 (December 1, 2017); *id*. at 1405 (December 2, 2017); *id*. at 1408 (December 4, 2017); *id*. at 1411 (December 4, 2017); *id*. at 1414 (December 26, 2017); *id*. at 1417 (December 27, 2017); *id*. at 1420 (January 4, 2018); *id*. at 1426 (January 4, 2018); *id*. at 1429 (January 19, 2017); *id*. at 1432 (January 21, 2018); *id*. at 1435 (January 29, 2018); *id*. at 1438 (January 31, 2018); *id*. at 1443 (February 23, 2018).
[235] Rec. 2370.
[236] Rec. 1533–34.
[237] Rec. 1533.
[238] *Id.*

importantly, and critical to the court's determination here—United failed to grapple with the specific facts that could have justified awarding benefits just as inadequately as it failed to address the medical opinions that may have justified the denial of benefits. The beneficiary and the court are left with no way of discerning the degree to which United engaged with the record.

Indeed, there was a dramatic decrease in physical intervention incidents during the prior month, February 2017,[239] not that United explained that reviewers relied on this fact in the denial letter. Even still, the latest incident occurred on February 23—just days before the period in which United deemed E.Z. safe enough to be treated at a lower level of care. The incident was significant. E.Z. threatened to kill staff and repeatedly kicked them, requiring physical restraint after recognizing that he "was a threat to their safety."[240] Importantly, E.Z. did all this even while living in a highly regulated, therapeutic environment. The reviewers failed to explain some kind of change that could justify their judgment that he would have been safe in a less secure environment, let alone in a home with a history of frequent tumult. Additionally, E.Z.'s treating professionals were only just beginning to consider the possibility of a gradual transition home. There was no attempt to address any of these facts in the letter.

United's final October 16, 2018 letter denying coverage from August 10, 2018 and forward continues the pattern. The letter states that "he presented no serious acute behavioral management challenges. There was no suicidal or self-harm thinking; no self-harmful behaviors were reported. He posed no risk of harm to others."[241] These conclusions are in tension with the record. E.Z. was taken off strict suicide precautions on July 30, 2018—only days before August

---

[239] *See* Rec. 1368–1442.
[240] Rec. 1444.
[241] Rec. 2763–64.

10—the date United considered E.Z. to be safe enough for a lower level of care. On August 22, 2018, E.Z. had to be physically restrained after he presented "an imminent danger of harm to others" when he started punching the walls of his bedroom, kicking his door, and yelling threats to harm peers and staff.[242]

In a recent opinion, the Tenth Circuit scrutinized an administrator's denial letter that asserted that a member's claim lacked any support from clinical records.[243] In *David P. v. United Healthcare Insurance Company*, the Tenth Circuit reviewed a denial letter stating that there was "*no* clinical information" indicating a need for RTC treatment when the record contained several instances of caregivers recommending RTC treatment.[244] The court held that the administrators "shut their eyes to readily available information" when they refused to engage with the providers' opinions while claiming that there was no information in the record that would warrant coverage.[245]

Here, United's October 16, 2018 letter failed to engage with E.Z.'s healthcare providers' recommendations and it failed to engage with facts that could have confirmed E.Z.'s theory of coverage. It failed to acknowledge that attempts to put E.Z. on the path to transition to a lower level of care demonstrated that he may have still needed RTC treatment. On August 14, 2018, E.Z.'s treatment notes stated that E.Z. had "poor boundaries . . . both in programming and on his visits."[246] On a visit home, he stole his dad's phone to view pornography, indicating a possible

---

[242] Rec. 2435.
[243] *David P.*, 77 F.4th at 1312.
[244] *Id.*
[245] *Id.*
[246] Rec. 2293.

risk that E.Z. required more sexual behavioral therapy.[247] On August 29, his therapist noted that "[E.Z.] has concerns about [transitioning] home . . . and recognizes that he would be unsafe at this time."[248] On September 10, 2018, E.Z.'s therapist explained "the reasons why going home right now would be detrimental."[249] These notes indicated concern about an immediate transition home. United should have addressed these concerns when it determined that RTC care was no longer necessary as of August 10, 2018.

Like the denial letter in *David P.*, which concluded that there was "no clinical information" indicating the need for treatment, the October 16, 2018 denial letter similarly asserted that E.Z. "posed *no* risk of harm . . . he was not assaultive, combative, or destructive," "he no longer appeared to need 24-hour . . . care," and "there was no suicidal or self-harm thinking"[250] However, the letter here differs from the prior letters slightly. The reviewers qualified their conclusions by stating that "[l]ikely expectable residual features of his condition remained and were not of serious intensity."[251] In other words, the reviewers acknowledged that his behavior was not perfect—but certainly this statement did not mean that "assaultive, combative, self-harmful, or destructive" behavior was "expectable." The fact remains that United concluded that E.Z. "posed *no* risk of harm" in spite of contradictory evidence.

---

[247] Rec. 2295. In light of E.Z.'s troubling history with targeting girls with disabilities and inappropriate touching of peers and caregivers, E.Z.'s failure to demonstrate self-control warrants attention. This overnight stay was one of the first instances since he began RTC treatment where E.Z. was entrusted with an unstructured environment for an extended period of time. Resisting pornography at his dad's house was a goal in treatment: his therapist identified the act as a "trigger" for his "behavioral cycle." Rec. 1346. The fact that he failed to resist this early into testing home visits requires attention.
[248] Rec. 2283.
[249] Rec. 2710.
[250] Rec. 2764.
[251] *Id.*

United appears not to have engaged with the parts of the record potentially undercutting its decision. In addition to providers' repeated concerns about an immediate transition home, on August 22, 2018, Northwest staff had to engage in physically enforced separation "due to his actions posing an imminent danger of harm to others."[252] He hit and kicked staff and punched the walls in his room.[253] Other physical intervention reports, seven of which occurred in July 2018 alone, indicate that he may have been a danger to others.[254] The record also reflects a risk of being a danger to himself: he was frequently placed on suicide precautions during the prior three months.[255] The letter failed to address E.Z.'s risk of harm at a lower level of treatment (e.g., day treatment while living at home), despite record evidence of frequent interventions and precautions needed to avoid harm in an RTC environment. This failure to engage with the record and explain the rationale for the denial indicates that administrators "shut their eyes to readily available information."[256]

### 2.     Failure to Explain Adverse Medical Necessity Decision

---

[252] Rec. 2435.

[253] *Id.*

[254] Rec. 2450 (July 4, 2018); Rec. 2447 (July 6, 2018); Rec. 2444 (July 17, 2018); Rec. 2441 (July 18, 2018); Rec. 2438 (July 19, 2018); Rec. 2435 (August 22, 2018).

[255] Rec. 2344 (On April 24, 2018, E.Z. was placed back on strict suicide precautions after he articulated a thought with a specific plan and intent); Rec. 2459 (On May 18, 2018, E.Z. was placed on strict suicide precautions); Rec. 2452 (On June 9, 2018, E.Z. was placed on strict suicide precautions); Rec. 2642 (On July 6, 2018, case manager reported to parents that E.Z. was placed on strict suicide precautions); Rec. 2316 (On July 9, therapist noted that he remained on strict suicide precautions); Rec. 2313 (On July 12, 2018, therapist noted that due to impulsive behaviors, E.Z. was placed on strict suicide precautions); Rec. 2437 (On July 19, 2018, E.Z. was placed on strict suicide precautions); Rec. 2646 (On, July 20, 2018, E.Z. articulated suicidal thoughts with a specific plan); Rec. 2308 (On July 23, 2018, therapist noted that he remained on strict suicide precautions due to him articulating specific plan); Rec. 2304 (On July 26, 2018, therapist reported that E.Z. will remain on strict suicide precautions during the week due to being in an "escalated state of dysregulation"); Rec. 2299 (on August 2, 2018, therapist notes that E.Z. was completely removed from suicide precautions).

[256] *David P.*, 77 F.4th at 1310–11.

Plaintiffs argue that United's reviewers failed to adequately explain their decisions when they appeared to be inconsistent and lacked coherent reasoning.[257] ERISA requires that an administrator's explanation of a clinical or medical judgment "may not be conclusory and any health conclusions must be backed up with reasoning and citations to the record."[258] The explanation must also "apply the terms of the plan to the claimant's medical circumstances."[259]

United's denial letters do not meet these minimum standards. For example, the September 26, 2017 letter concludes that denial is not warranted in part because "his evaluation is complete."[260] But United failed to explain how this conclusion is relevant to the "Guidelines" or to which guideline this conclusion was applied.[261]

Relatedly, United failed to "explain, in language Plaintiffs could understand"[262] its conclusion that "[b]ased on our Level of Care Guideline[s] . . . no further authorization can be provided from 3/01/2018"[263] to "3/21/2018 . . . [and] 8/10/2018 forward."[264] United simply made conclusions without further explanation. The extent of their reasoning was limited to an assertion that "benefit coverage is partially available for the following reasons" followed by a series of factual conclusions.[265] Whether each conclusion supports or undermines "partially available" coverage is left open for interpretation. In short, the denial decision "was not backed up with reasoning and citations to the record."

---

[257] Pls.' Opp'n 16, 21, 23–24; Pls.' MSJ Reply 4.
[258] *David P.*, 77 F.4th at 1312 (citing 29 C.F.R. § 2560.503-1(g)(1)(v)(B)).
[259] *Id.*
[260] Rec. 1504.
[261] Rec. 1504.
[262] *David P.*, 77 F.4th at 1313.
[263] Rec. 1534.
[264] Rec. 2764.
[265] April 17, 2018 Denial Letter, Rec. 1533; October 16, 2018 Denial Letter, Rec. 2763.

Defendants respond by providing alternate explanations justifying United's decisions. None of these explanations were provided to E.Z.'s parents in the denial letters. United contends that its decision to deny benefits from March 1, 2018 to March 20, 2018 was the result of the filing of a "new treatment episode" which began on March 21, 2018.[266] When E.Z.'s parents appealed United's initial denial of the "new treatment episode," that appeal only dealt with the period starting March 21, 2018. In other words, the appellate review could not procedurally overturn the denial of benefits for dates earlier than March 21, 2018. If this was a basis for the eventual decision to deny benefits on March 20 but to award benefits on March 21, the question remains—why did United not reference the procedure in any of the denial letters to E.Z.'s parents as a basis for its decision?

Instead, the appeals letters contain reasoning that, when considered collectively, arguably conflict with the result. E.Z.'s parents were left having to guess why benefits were warranted between March 21 and August 9 but not before or after, when the appeals letters cited similar factual conclusions supporting the same determination that "benefit coverage is partially available."[267]

The panel charged with reviewing the first level one appeal request concluded that "[E.Z.] made progress . . . . He was medically stable. He was not having thoughts to harm himself or others. He participated in treatment."[268] The appellate review decision that overturned the denial of benefits from March 21 to August 9, 2018 similarly concluded that "your child made progress . . . . He was adherent with all aspects of his treatment plan. . . . There was no

---

[266] Defs.' MSJ 31–32.
[267] *Compare* Rec. 1533, *with* Rec. 2763.
[268] Rec. 1533.

suicidal or self harm thinking . . . . He posed no risk of harm to others."[269] These similar justifications seemingly point to a conclusion that every treatment period from March 2018 forward should have had a uniform result. Yet, with no further explanation, both decisions on appeal overturned part of the relevant period and affirmed the denial at the end of the period. The language in the letters and the conflicting results highlight the flaw in United's claim processing: reviewers repeatedly failed to explain how they arrived at these conclusions and how each conclusion applied to their guidelines.

In short, United's denial letters fell short. The letters only made conclusory statements about E.Z.'s condition and needs. Some of the statements were in apparent tension with record evidence and treating professionals' opinions, but none of the records or opinions were discussed. The internal appeal also failed to apply United's conclusions to the specific guidelines at issue. United's claims processing here was not a "full and fair review" of E.Z.'s record, nor did United provide E.Z's parents with a "meaningful dialogue."

Defendants counter by accusing Plaintiffs of "cherry picking" evidence when there exists substantial evidence supporting United's decisions.[270] At issue is United's claims processing practices, which require United to back up conclusions with reasoning and discussion of the record, which includes engaging with contrary evidence, if such evidence could prove a claimant's theory of coverage.

### D.    Remedy

---

[269] Rec. 2764.
[270] Defs.' MSJ Reply 13–14.

Having determined that United acted arbitrarily and capriciously when it failed to comply with ERISA's claims processing requirements, the court must decide whether to remand for the plan administrator's "renewed evaluation of the claimant's case" or to award benefits.[271] This decision "hinges on the nature of the flaws in the administrator's decision."[272] Typically, "remand is appropriate if the administrator failed to make adequate factual findings or failed to adequately explain the grounds for the decision."[273] "But if the evidence in the record clearly shows that the claimant is entitled to benefits, an order awarding such benefits is appropriate."[274] If the record contains both evidence supporting Plaintiffs' claims for benefits and evidence supporting the denial of benefits, it cannot be said that the record "clearly shows" that the claimant is entitled to benefits.[275]

If benefits are not awarded, remand is proper. A remand, however, "does not provide the plan administrator the opportunity to reevaluate a claim based on a rationale not raised in the administrative record, and not previously conveyed to plaintiffs."[276] Thus, in evaluating whether United's interpretation of the plan was "reasonable and in good faith," the court reviews only those rationales that are in the administrative record and conveyed to plaintiffs. The court now turns to whether "the record clearly shows" that coverage is warranted during four relevant

---

[271] *Weber v. GE Grp. Life Assur. Co.*, 541 F.3d 1002, 1015 (10th Cir. 2008) (quoting *Flinders*, 491 F.3d at 1193).
[272] *Carlile v. Reliance Standard Life Ins.*, 988 F.3d 1217, 1229 (10th Cir. 2021).
[273] *David P.*, 77 F.4th at 1315 (cleaned up); *see id.* (citing *Spradley v. Owens-Illinois Hourly Emps. Welfare Ben. Plan*, 686 F.3d 1135, 1142 (10th Cir. 2012)) ("[R]emand is more appropriate where plan administrator failed to make adequate factual findings or failed to explain adequately the grounds for its decision to deny benefits, but not if the administrator instead gave reasons that were incorrect"); *Buffonge v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 31 (1st Cir. 2005) (concluding remand as the proper remedy when the "problem is with the integrity of [the plan administrator]'s decision-making process").
[274] *David P.*, 77 F.4th at 1315 (cleaned up).
[275] *David P.*, 77 F.4th at 1314 n.17.
[276] *David P.*, 77 F.4th at 1315.

periods: (1) from March 1 to March 20, 2018; (2) from August 10 to August 22, 2018; (3) August 23 to September 12, 2018; and (4) from September 13, 2018 to April 12, 2019.

### 1.    March 1 to March 20, 2018

First, context matters. This is especially true when reviewing a brief treatment period of less than three weeks in the middle of a much longer course of treatment. United deemed RTC benefits to be medically necessary as of February 28 and March 21, but not between those dates. The implication is that E.Z. should have left RTC treatment on March 1 and returned on March 21.

E.Z. was admitted to Northwest to address recent dangerous behavior to himself, his family, and the public. The seriousness of his pre-Northwest conduct is obvious. He invited a six-year-old girl to watch pornography.[277] He sexually assaulted a classmate with special needs because he thought that she would not report him.[278] Other similar allegations surfaced again involving a different girl with special needs.[279] In July of 2017, E.Z. was expelled from a summer program for special needs kids after he inappropriately touched two of his counselors.[280] He also inappropriately touched an eighteen-year-old neighbor.[281] E.Z.'s treatment at lower levels of care was ineffective in treating his behavior, and his therapists before and after his admission to Northwest believed that RTC treatment was necessary for progress.[282]

With that context in mind, the fact that as of March 5, 2018, E.Z. was using his sexual therapy materials to masturbate in front of Northwest staff showed he was not ready for a lower

---

[277] Rec. 1139, 1082, 1548.
[278] Rec. 1139, 1082, 1549.
[279] Rec. 1549.
[280] Rec. 1184. 1552.
[281] Rec. 1183, 1553.
[282] Rec. 1144, 1155, 1295.

level of care.[283] Even within the strict confines of the RTC facilities, E.Z. managed to demonstrate compulsive sexual behavior. In the face of this evidence, United determined that a *less* restrictive environment was appropriate under the rationale that "the symptoms that caused [him] . . . to be admitted have improved," and that "there was no clinical information provided to support the medical necessity for ongoing treatment in a 24-hour setting."[284] By March 2018, E.Z. was only a few months removed from his most recent predatory episode. United failed to explain how E.Z.'s predatory behavior had improved, let alone improved enough to warrant an immediate transfer to less intensive care.

The fact that some therapists' notes may have indicated that E.Z. was improving in other ways does not change the fact that E.Z. still presented a risk of impulsive, predatory behavior during the contested period. For example, E.Z. could have participated earnestly in group therapy while still acutely presenting a risk of harming others. Given E.Z.'s established pattern of sexually assaultive conduct, the record does not reasonably support an alternate conclusion. The March 5 note and related evidence therefore sufficiently demonstrates that Plaintiffs were entitled to benefits. United's determination that there was "no clinical information" that supported medical necessity is incorrect.

Plaintiffs also allege that E.Z.'s risk of violence entitled them to relief. It has already been established that E.Z. required physical intervention protocols less than a week before March 1 and after March 20, 2018, but not between those dates. E.Z. was put on suicide prevention

---

[283] Rec. 2370.
[284] Rec. 1996. Defendants also allege that because there is no evidence of suicidal or violent behavior from March 1 to March 20, he could have been treated at a lower level of care. Defs.' MSJ Reply 8–9. This argument unfairly moves the goalposts. Under this rationale, Defendants could identify any period that lacks certain evidence and deem care not medically necessary, creating a patchwork of covered and uncovered treatment.

protocols several times after these dates, the first of which occurred on April 24, 2018.[285] And

even though E.Z. did not require physical intervention or suicide prevention protocols during the

contested period, his treating professionals did not indicate that he was ready for a safe treatment

transition.

To the contrary, on February 21, E.Z.'s therapist concluded that "E.Z. is not ready for

discharge."[286] One of E.Z.'s therapists made clear that as of March 28, E.Z. was only "beginning

to have awareness" of his emotional triggers.[287] He still struggled with relatively minor changes

in his highly regulated environment as new patients came and left.[288] Indeed, therapist notes

following an April 2018 visit explains that a recent suicidal episode appeared to be "influenced

by his environment" at home, which was "very dysregulated [that] week."[289] These facts clearly

point to the conclusion that E.Z.'s treating professionals did not consider his condition to be safe

for an immediate transition on March 1, 2018 to a less intensive treatment.[290]

Defendants point to internal notes to confirm that their decision is supported by materials

in the administrative record.[291] The notes do not directly undermine coverage, but even if they

did, they cannot be used retroactively when the underlying information was never conveyed to

---

[285] Rec. 2344.
[286] Rec. 1350.
[287] Rec. 2356.
[288] Rec. 2360, 2364. "[E.Z.] reports that he's had a terrible day . . . he was put on focus for talking back and then received a higher focus when he began swearing about being put on focus. . . . [E.Z.] appears to be hyperfocused on the changes that are happening within programming next week." Rec. 2364. After the new changes in the program were implemented, E.Z.'s therapist concluded that E.Z. "continues to struggle with his peers. It appears as though increased time together has been increasing difficulty in the house." Rec. 2360.
[289] Rec. 2342.
[290] There is also evidence that his treating professionals did not believe that E.Z.'s risk for property destruction dramatically reduced during March. A physical intervention report dated April 17, 2018 stated that E.Z. "has a history of destroying items while he is in the observation room" implying that destruction to property was an ongoing and continuing risk while at Northwest. Rec. 2474.
[291] Defs.' MSJ Reply 9–10.

Plaintiffs in the pre-litigation administrative record.[292] In any event, the notes involve a period in which RTC benefits were awarded.[293] Thus, United already implicitly determined that the phone call did not contain sufficient evidence to deny benefits.

Defendants also rely on the fact that one of E.Z.'s treating professionals made the following conclusions: he "made drastic progress," regulated himself more effectively, "follow[ed] staff direction," and he was ready for an "off grounds visit."[294] These statements do not directly undermine evidence already discussed that indicates that E.Z. required RTC treatment. And even if he had improved in following directions or regulating himself, this evidence does not necessarily indicate that he was safe for an immediate transition. His therapist instead concluded that he was only ready for *a single off-grounds visit*.[295] The conclusion that E.Z. was ready for an "off-grounds visit" does not mean he was ready for an immediate transfer home to begin a partial hospitalization program. In short, the administrative record clearly confirms that that E.Z. was entitled to coverage. Because remand is unnecessary, Plaintiffs are awarded benefits under the Plan from March 1 to March 21, 2018.

---

[292] "Only the rationales articulated to the beneficiary in the denial letter are eligible for review, both in the administrative appeal and before this court." *Ian C. v. UnitedHealthcare Ins. Co.*, 87 F.4th 1207, 1226 (10th Cir. 2023). "United cannot avail itself of peer-to-peer conversations with . . . staff . . . to defend its decision because these materials were not conveyed to" the plaintiff." *Id.*

[293] Rec. 2763.

[294] Defs.' MSJ Reply 13–14; Rec. 2598. Defendants also rely heavily on E.Z.'s therapist's statement that "[E.Z.] did well utilizing skills and not escalating to the point of vocalizing suicidal ideation or needing any sort of physical intervention." Defs.' Opp'n (quoting Rec. 2598). Reliance on this statement is not warranted for a few reasons. First, it lacks proper context. This statement comes from a weekly report to E.Z.'s parents and only pertains to E.Z. behavior that week. In other words, the impact of the report is limited in scope. Second, the sentence before states that E.Z. "had some difficulty regulating himself at times throughout the week." Rec. 2598. That is far from the unqualified, glowing endorsement that Defendants make it out to be. Third, the very next interaction between this therapist and E.Z.'s parents states that "E.Z. has a habit of being extremely close to others . . . when excited he will grab peers or staff while in conversation." Rec. 2601. Thus, this same evidence supports a finding that E.Z. still demonstrated a risk of inappropriate touching even though it also supports a finding that he was improving. Both can be true at once.

[295] Rec. 2598.

### 2.   August 10 to August 22, 2018

The same is true for the period from August 10 to August 22, 2018. It is noteworthy that only just over two weeks prior to August 10, treatment notes describe a pattern of E.Z. struggling with "significant changes to programming."[296] A few weeks before the contested time period, a therapist concluded that "E.Z. has not demonstrated consistency in his ability to communicate effectively or regulate himself in times of distressing emotions."[297] On July 23, E.Z. was put on strict suicide precautions after articulating a specific plan and intent to harm himself.[298] Those precautions lasted until July 30, 2018. It was only after significant effort and careful coordinating that E.Z. was able to go on short weekend trips on August 3 and August 10.[299] His treating professionals were not recommending that he was ready for an even greater step forward after only two mostly successful brief visits home.

Indeed, Northwest repeatedly made clear that E.Z. was not ready to safely transition to an outpatient program as of August 22. While the transition process was underway by that date, this fact does not indicate that E.Z. could have transitioned on August 10 in a safe manner. To the contrary, there is evidence that his condition would not have been safe in a less intensive setting. On August 22, E.Z.'s behavior escalated to the point where Northwest staff had to initiate physical intervention protocols.[300] After hitting and kicking the walls of the facility, entering a restricted area described as the "observation room," and "making threats to harm peers

---

[296] Rec. 2309.
[297] *Id.*
[298] Rec. 2308.
[299] And even after this significant effort, on August 6, 2018, E.Z. claimed that "being dysregulated and having outbursts helped him" and E.Z was "not interested" in working on finding "ways to replace his verbal and physical aggression." Rec. 2702.
[300] Rec. 2435.

and staff," Northwest employees had to initiate "physically enforced separation . . . due to [E.Z.'s] actions posing an imminent danger of harm to others."[301] In light of how quickly and without warning E.Z. escalated, the constant evaluation and support that RTC provides is clearly supported by the record.

E.Z.'s behavior during his overnight visits home also indicates that he was not ready for a transition to a lower level of care. Relevant to this analysis is a conversation between a Northwest therapist and E.Z.'s family. This discussion centered on identifying ways to implement successful home visits. E.Z.'s therapist identified certain triggers that could prevent E.Z. from transferring the skills he learned at Northwest.[302] The only specific trigger that the therapist identified was the act of viewing pornography at his dad's house.[303] Meanwhile, in early August, E.Z. went on a multi-day stay at his dad's house.[304] During the visit, he stole his dad's phone to view pornography and then attempted to delete his browser history several times.[305] His therapist also noted that E.Z. risked facing "natural consequences if [he] continues these [boundary-violating] behaviors in a community setting."[306] These facts, taken in context E.Z.'s history of sexually predatory behavior, indicates that E.Z.'s risk of harm had not subsided.

The LOCG's for continued care at an RTC require that "[t]he member is not in imminent or current risk of harm to self, others, and/or property."[307] Moreover, treatment must be centered

---

[301] *Id*.
[302] Rec. 1346.
[303] Rec. 1346.
[304] Rec. 2295. The record shows that this was likely the first visit home since the week of May 30, 2018. Rec. 2685. Moreover, this appears to be the first multi-day visit home since arriving at Northwest.
[305] Rec. 2295.
[306] Rec. 2295. The progress note states that the "[t]herapist confront[ed] [E.Z.] on the negative portions of the visit. Discussed an overall theme of boundaries and why boundaries arc important. Discussed natural consequences if Ethan continues these behaviors in a community setting." *Id*.
[307] Rec. 604, 618.

on "improving that function to an extent that might allow for a more independent existence."[308] For the reasons explained, E.Z. presented a significant risk of harm to others and property up until August 22.[309] The record also demonstrates that his care was focused on providing an independent existence—Northwest was actively working towards and discussing plans to transfer.[310]

Defendants do not identify any evidence before August 22, 2018 that would support a decision to deny benefits. First, they cite to a weekly report email sent to E.Z.'s parents on August 3.[311] But the August 3 email deals with dates of service that were covered by United.[312] Second, Defendants cite progress notes that discuss therapists' conversations with E.Z. about potentially transitioning to a lower level of care.[313] Evidence that they contemplated stepping treatment down in the future is not evidence that E.Z. was ready for an immediate transition.

In short, in the context of E.Z.'s history of violent and predatory behavior, plaintiffs have identified facts in the record that strongly support a finding that E.Z. was entitled to benefits from August 10 to August 22, 2018. Defendants have not identified apposite contrary evidence. Thus, the court finds that the administrative record clearly supports awarding benefits from August 10 to August 22, 2018.

### 3.   August 23 to September 12, 2018

---

[308] *Id.*
[309] Rec. 2435.
[310] Rec. 2293.
[311] Defs.' MSJ Reply 14.
[312] Rec. 2655–56.
[313] Defs.' MSJ Reply 14 (citing Rec. 2706, 2708-09, 2712).

There is not sufficient evidence after August 22 that "so clearly points the other way as to make a remand unnecessary."[314] From August 23 forward, there are no reports of physical intervention, threats against others, or suicide precaution measures. Having considered the evidence on the record, the court cannot say that the "record clearly shows" that Plaintiffs are entitled to benefits.[315] The last medical record in the administrative record is dated September 12, 2018.[316] Remand is appropriate to determine whether Plaintiffs were entitled to benefits from August 23 until at least September 12, 2018.

In short, in light of the court's earlier determination that United "failed to make adequate factual findings [and] failed to adequately explain the grounds for its decision," and because the court cannot say that the "record clearly shows" coverage is warranted, "remand is appropriate" for treatment from August 23 to September 12, 2018.[317]

### 4.    September 13, 2018 to April 12, 2019

The administrative record contains no medical records from September 13, 2018, until April 12, 2019, the date of E.Z.'s discharge from Northwest. The parties blame each other for the medical records' absence.

Defendants argue that Plaintiffs failed to provide "treatment records in support of their claim," that the Appeals Panel "reviewed all of the treatment records submitted by the Plaintiffs," and that "Plaintiffs never requested that [United] reconsider its administrative appeal

---

[314] *Carlile v. Reliance Standard Life Ins.*, 988 F.3d 1217, 1220 (10th Cir. 2021) (citing *Spradley v. Owens-Illinois Hourly Emps. Welfare Ben. Plan*, 686 F.3d 1135, 1142 (10th Cir 2012)).
[315] *David P. v. United Healthcare Ins. Co.*, 77 F.4th 1294, 1315 (10th Cir. 2023) (citing *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1015 (10th Cir 2008).
[316] Rec. 2275.
[317] *David P.*, 77 F.4th at 1315.

50

based on new evidence."[318] Defendants also note that they later (post-denial) made numerous requests to Northwest for additional medical records, but Northwest never supplied the medical records.[319]

On the other hand, Plaintiffs argue that "United erred when it denied claims for the time frame after September 12, 2018, without telling K.Z. that he needed to provide medical records to United so that it could determine the medical necessity of E.Z.'s treatment after that date."[320] Plaintiffs acknowledge United's subsequent requests to Northwest, but argue that given the case's history of initial denials, followed by the family appealing those denials on the basis of medical records they supplied, that UBH should have requested the records from the family.[321]

The result here is determined by the peculiar facts of this record. The only denial letter that addresses the coverage period in question is dated October 16, 2018. The denial letter responds to Plaintiffs' appeal dated September 26, 2018, which is itself a challenge to United's April 11, 2018 denial of coverage from "3/21/18 and forward." United's October 16, 2018, denial letter both contains a partial reversal of the April 11, 2018, denial of coverage and a new determination that "coverage is not available for 8/10/2018 forward," a date which had never been addressed previously.

At a bare minimum, UBH's denial letter created ambiguity. It was preceded by the previously described inadequate denial letters. It then compounded the difficulties by informing Plaintiffs that it was the "Final Adverse Determination" determining that "coverage is not available for 8/10/2018 forward" and "[a]ll internal grievance reviews through UBH have been

---

[318] Defs.' MSJ Reply, 15-16.
[319] Defs.' MSJ Reply 16 (citing Rec. 769–791).
[320] Pls.' MSJ Reply 12–13.
[321] Pls.' Opp'n 15–16.

exhausted."[322] It says nothing suggesting that a further review would be entertained. Here, a "Final Adverse Determination" of the appeal might reasonably be read by Plaintiffs to be the end—no further action or step is suggested. On a different record, the foregoing might have made no difference. But here, in the context of the totality of this record, Defendants' argument that Plaintiffs failed to take an additional needed step rings hollow.

Relatedly, there is also the issue of administrative exhaustion. "Exhaustion of administrative . . . remedies is an implicit prerequisite to seeking judicial relief" under ERISA.[323] "A participant's cause of action under ERISA accordingly does not accrue until the plan issues a final denial."[324] In addition to the requirement found in binding precedent, the Plan itself also requires that members "complete[] all the steps in the grievance process" before bringing any legal action to recover benefits.[325] As stated earlier, the Plan lays out a two step-process: an initial benefits determination and an internal grievance review process.[326] Exhaustion is met upon completing  the internal review process.[327] Here, United's "Final Adverse Determination" affirmatively informed Plaintiffs that coverage was not available from August 10, 2018 "forward" and that "[a]ll internal grievance reviews through UBH have been exhausted." On this

---

[322] Rec. 2765.

[323] *Held v. Manufacturers Hanover Leasing Corp.*, 912 F.2d 1197, 1206 (10th Cir. 1990); *See Heimeshoff v. Hartford Life & Acc. Ins. Co*, 571 U.S. 99, 105 (2013) ("The courts of appeals have uniformly required that participants exhaust internal review before bringing a claim for judicial review.")

[324] *Heimeshoff*, 571 U.S. at 105.

[325] Rec. 61, 255, 454.

[326] Rec. 47–48, 240–241, 439–440.

[327] *See* Rec. 61, 255, 454. "You cannot bring any legal action against us to recover reimbursement until you have completed all the steps in the appeals process. The *internal* grievance process may be deemed exhausted per 45 C.F.R. 147.136(b)(2)(ii)(F). . . . After completing that process, if you want to bring a legal action against us you must do so within three years of the date we notified you of our final decision on your appeal." *Id.* (emphasis added).

record, Plaintiffs were justified in relying on United's averment that its decision was final and exhaustion had occurred.

"ERISA contemplates 'an ongoing, good faith exchange of information between the administrator and the claimant.' These interests are not served by federal court review of an incomplete administrative record."[328] United's actions denied Plaintiffs adequate exchange of information, resulting in an incomplete record. "[P]remature judicial interference with the interpretation of a plan would impede those internal processes which result in a completed record of decision making for a court to review."[329] Because the court is faced with an incomplete record for the period of time in question due to procedural irregularities, the appropriate remedy is a remand to United for review on a completed record.[330]

## ORDER

Accordingly, the court GRANTS IN PART Plaintiffs' motion and DENIES Defendants' motion. The court awards Plan benefits from March 1 to March 20, 2018 and from August 10 to August 22, 2018 and REMANDS the benefits determination from August 23, 2018 to April 12, 2019 to Defendants for further review of Plaintiffs' benefits claim consistent with this Memorandum Decision and Order.

Signed February 16, 2024.

BY THE COURT

---

[328] *Messick v. McKesson Corp*, 640 Fed. Appx. 796, 799 (10th Cir. 2016) (quoting *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 635 (10th Cir. 2003)).

[329] *Finley v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 379 F.3d 1168, 1174 (10th Cir. 2004).

[330] Given the Court's conclusion, it does not reach the merits of Plaintiffs' Mental Health Parity and Addiction Equity Act (MHPAEA) claims.

David Barlow
United States District Judge